Eric R. Havian (California Bar No.102295)
Claire M. Sylvia (California Bar No. 138990)
PHILLIPS & COHEN LLP
131 Steuart Street, Suite 501
San Francisco, California 94105
Tel: (415) 836-9000
Fax: (415) 836-9001

Matthew R. Howell (#6571)
FILLMORE SPENCER LLC
3301 North University Avenue
Provo, Utah 84604
Tel: (801) 426-8200
Fax: (801) 426-8208

Attorneys for Plaintiff

FILED
2006 APR 10 P 4: 20

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| [UNDER SEAL], | Case No. |
| Plaintiff, | COMPLAINT |
| vs. | |
| [UNDER SEAL], | (FILED IN CAMERA AND UNDER SEAL PURSUANT TO 31 U.S.C. §§ 3729 et seq.) |
| Defendant. | |

```
Judge Ted Stewart
DECK TYPE: Civil
DATE STAMP: 04/10/2006 @ 16:21:44
CASE NUMBER: 1:06CV00039  TS
```

Complaint

Eric R. Havian (California Bar No. 102295)
Claire M. Sylvia (California Bar No. 138990)
PHILLIPS & COHEN LLP
131 Steuart Street, Suite 501
San Francisco, California 94105
Tel: (415) 836-9000
Fax: (415) 836-9001

Matthew R. Howell (#6571)
FILLMORE SPENCER LLC
3301 North University Avenue
Provo, Utah 84604
Tel: (801) 426-8200
Fax: (801) 426-8208

Attorneys for Qui Tam Plaintiff Kendall Dye

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. KENDALL DYE, <br><br> Plaintiffs, <br><br> vs. <br><br> ATK THIOKOL, INC. <br><br> Defendant. | Case No. <br><br> COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 U.S.C. §3729 et seq.] <br><br> JURY TRIAL DEMANDED <br><br> **(FILED IN CAMERA AND UNDER SEAL)** |

Plaintiff-relator, Kendall Dye, through his attorneys Phillips & Cohen LLP and Fillmore Spencer, on behalf of the United States of America for this Complaint against defendant, ATK Thiokol, Inc., alleges based upon personal knowledge, relevant documents, and information and belief, as follows:

## I. NATURE OF THE ACTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent statements, records, and claims made and

caused to be made by Defendant and/or its agents, employees in violation of the Federal False Claims Act, 31 U.S.C. §§ 3729 et seq. ("FCA"). The Complaint alleges that Defendant knowingly submitted claims for payment to the United States Government for defective products that failed to conform to safety specifications and that Defendant falsely certified compliance with those specifications, all in violation of 31 U.S.C. § 3729(a)(1) and (a)(2).

2.  The FCA was originally enacted during the Civil War to redress fraud against the Government, including fraud in the sale of defective products to the military. Congress substantially amended the Act in 1986 to enhance the Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the Act, which Congress characterized as the primary tool for combating Government fraud, was in need of modernization. Congress intended the amendments to create incentives for individuals with knowledge of fraud against the Government to disclose the information without fear of reprisals or Government inaction, and to encourage the private bar to commit legal resources to prosecuting fraud on the Government's behalf.

3.  The FCA provides that any person who presents or causes to be presented false or fraudulent claims for payment or approval to the United States Government, or knowingly makes, uses, or causes to be made or used false records and statements to induce the United States to pay or approve false and fraudulent claims, is liable for a civil penalty of up to $11,000 for each such claim, plus three times the amount of the damages sustained by the federal government.

4.  The FCA allows any person having information about false or fraudulent claims to bring an action on behalf of the government, and to share in any recovery. The FCA requires

that the complaint be filed under seal for a minimum of 60 days (without service on the Defendant during that time) to enable the United States (a) to conduct its own investigation without the Defendant' knowledge, and (b) to determine whether to join the action.

5. Based on the FCA, qui tam plaintiff and relator Kendall Dye seeks to recover all available damages, civil penalties, and other relief for the federal violations alleged herein.

## II. INTRODUCTION

6. The United States Department of Defense spends millions of dollars each year on flares, which it uses to illuminate nighttime combat and rescue missions. The contracts that Defendant entered into with the Government for the purchase of flares require that the flares comply with a number of military standards for reliability and safety.

7. From 2000 to 2005, Defendant knowingly supplied the Government with flares that did not comply with the contractual requirements that the flares be capable of withstanding a drop of 10 feet without igniting and falsely certified that the flares complied with those safety requirements. Defendant did not notify the Government of the potential hazard until November 2005 and even then did not inform the Government of the scope of the threat from the unsafe flares. Upon being notified of the potential danger, the Government ceased using the flares, except for emergencies, and has stored approximately 40,000 to 50,000 unused flares in a warehouse.

## III. PARTIES

### A. The Relator

8. Plaintiff/relator Kendall Dye ("Relator") is an individual residing in Ogden, Utah. From 1984 to the present, the relator has worked at Defendant ATK Thiokol, Inc., or its

predecessor. In 1998, the relator was assigned to work on the flare program as a program quality manager. In 2005 he became the program manager for the Defendant's LUU Flare Program.

**B. The Defendant**

9. Defendant ATK Thiokol, Inc. is a Delaware corporation and a wholly-owned subsidiary of ATK Alliant Techsystems, Inc., with headquarters in Brigham City, Utah. ATK Thiokol manufactures missiles, rocket motors, and other military and aerospace products, including flares.

## IV. JURISDICTION AND VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1367, and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Under 31 U.S.C. § 3730(e), there has been no public disclosure of the "allegations or transactions" in this Complaint.

11. Personal jurisdiction and venue are proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a), as the Defendant is found in, has or had an agent or agents, has or had contacts, and transacts or transacted business in this district.

## V. DEFENDANT'S FRAUDULENT PRACTICES

**A.   Defendant's Military Flare Program**

12. Defendant manufactures several types of illuminating flares for the military. One product line used by the Air Force is a 3 foot, 36 pound flare designed to be dropped from fixed wing aircraft, such as the C-130 and the F-16. Defendant manufactures two types of these flares—the LUU-2C/B and the LUU-19A/B. The LUU-2C/B dispenses visible light that anyone

may see with the naked eye. The LUU-19A/B dispenses infrared light, which is designed to be seen only by individuals wearing night vision goggles.

13.     The LUU-2C/B flares burn for about 225 seconds with 1.6 million candle power, which lights up a square mile. Typically several flares will be dropped at one time. The price of an individual LUU flare is between $700 and $1,000, depending upon several factors, including the size of the order and other negotiated discounts.

14.     The military has several standards for ensuring that fuzes, such as flares, are safe to handle. These standards, set forth in Military Standard ("MIL-STD") 331-C (superceding MIL-STD-331B), include a 40-foot drop test, MIL-STD-331C, test A3, and a 5-foot drop test, MIL-STD 331-C, test A4.1. If other drop heights are considered possible given the intended use of the fuze or fuze components, the items should be tested in those conditions. See MIL-STD-331C, A3.6. Drop testing at different heights, such as 7, 10, 12 or 15 feet, may be specified as additional requirements by contract. MIL-STD-331C, A4.6.3.

15.     Defendant currently has several contracts with the Government for LUU flares. These contracts include # DAAA09-00-C-0083 with Rock Island Arsenal for 36,352 units of the LUU-2C/B flare at a price of $26,286,171 and # F42630-99-C-0287 with Hill Air Force Base for 50,274 units of the LUU-19A/B flare at a price of $49,588,410. Additional contracts for flares include #W52P1J-04-C-002 with Rock Island Arsenal and # F42630-01-C-0359, F42630-01-C-0329, FA82613-04-C-0026, and F42630-01-C-0334 with Hill Air Force Base. All of these contracts required the flares to comply with a 10-foot drop standard to ensure that the flares were safe to handle.

### B. Redesign of Defendant's LUU Flares

16. In the late 1990s, Defendant was having problems with its LUU flares failing to reliably ignite. Although the original design was very safe and had passed the stringent 40-foot drop test, the design did not provide the level of reliability the Defendant would have liked.

17. In 1998, Defendant arranged for Utah State University to develop a new design for the flares that would address the reliability concerns. The Utah State design team recommended replacing the igniter on the flare. The report and recommendations of the Utah State design team expressly stated that any design of the flare would need to meet the 10-foot drop test.

18. In 2000, the Air Force tested the new design for reliability. This test determined that the newly designed flare had a much greater degree of reliability. When dropped from a plane, the flares ignited 97 percent of the time, which was more than required by the Government's specifications for reliability. Defendant and the Air Force began to discuss contract modifications for the new flare design.

### C. Failure to Perform the Drop Test on the Newly Designed Flare

19. Before the Air Force would accept the new flare design, it requested that the flares pass an additional test that would ensure that the flares were not vulnerable to accidentally being ignited when the igniter was in the "no-fire" position. Unlike the 10-foot drop test, this test was not required by the contract specifications.

20. In an internal memorandum, Ray Beus, Defendant's Supervisor of Test Services, characterized the test requested by the Air Force as "bordering on a waste of time, since I cannot

comprehend how the primary ignition could ever occur as the customer suggest[s]." See Exhibit A (attached to this Complaint). He then stated:

> I would strongly suggest a more realistic scenario which might present a significant hazard to personnel/equipment: If the flare assembly receives a significant impact (i.e. dropped) I can foresee the inertia of the slider mechanism breaking the piece of polycarbonate that retains the ignition train in the no-fire position, resulting in complete ignition of the flare. Based on this scenario, I would recommend a few tests be performed to validate a drop height in determining a safe design (MIL-STD-331B, modified test A3 & A4.1). The drop would need to assure "specific orientation" so impact attitude is controlled. I am certain that Design Engineering has performed this calculation but I am not certain the test has been run to validate such calculations.

Id. He concluded by informing his superior that "[y]ou can relax, rest assured I did not include this comment/recommendation in the memo although I would have liked to." Id. Ray Beus sent these observations in an e-mail to Robert Elder, Defendant's then-LUU Program Manager, and sent copies of the e-mail to Michael Harper, Defendant's manager of test services, and John Holland, Defendant's supervising engineer. The memo on the test requested by the Air Force was forwarded to the Air Force and did not include any observations about the "more realistic scenario." The drop test was not performed and the Air Force was not informed of the concern that the new design might be unsafe when dropped. Instead, Defendant continued to certify that the flares met the contractual specifications that the flares were safe when dropped from a height of 10 feet.

### D. The Relator Discovers the Failure to Test the Flares

21. In 2005, the Navy indicated that it was interested in purchasing some LUU flares from Defendant. The Navy requires the flares it purchases to be safe if dropped from 40-feet

8

because it carries the flares on large ships, where a drop from such a height could easily occur. In order to determine if the Defendant's flares qualified for purchase, the Navy conducted its own drop test. In August 2005, the United States Navy informed ATK that its flares did not qualify for purchase by the Navy because they had failed the Navy's mandatory 40-foot drop test. Bob Winter, Director of Defendant's Flare operation, assigned to the relator, who had just been named LUU Program Manager, the task of determining why the flares failed the Navy's 40-foot drop test. Defendant was interested in obtaining the Navy's business and needed to address the failure before the Navy would purchase Defendant's LUU flares.

22.     As part of his investigation, the relator asked John Holland, the supervising engineer, to use the Navy's data to calculate the point at which the flares would ignite when dropped. Holland reported that the mathematical calculations suggested that the flares would fail when dropped from a height of between 11 inches and 46 inches, well below the 10-foot drop standard required by the specifications in Defendant's contracts with the Government. The relator's investigation also revealed that no documentation existed to show that the required 10-foot drop test had ever been conducted since the redesign of the flares in 2000, even though Government specifications require that documentation of the tests be maintained. In addition, the relator discovered that Defendant's employees were aware that the test had not been performed and that the new design for the igniter might create a hazard when the flares were dropped.

23.     On November 9, 2005, the relator, accompanied by several colleagues including Pat Smith and Dennis Beatty, tested five of the LUU flares. One flare failed when dropped from a height of 5 feet and one flare failed when dropped from a height of 10 feet. The relator tested

three additional flares at even lower heights, but they did not fail. These three flares that did not ignite were flares taken from a store of rejected flares that had had their igniter cables cut. The cable stub may have acted as a braking mechanism to stop the flare from igniting when dropped. As a result, the relator concluded that the failure of these three flares to ignite did not suggest that the flares could pass even a 3 foot drop test.

24. The relator notified his supervisor Bob Winter that based on this initial test and calculation, a 5 foot drop was not the extent of the threat, and that the flares could ignite if dropped from a much lower height. He advised that Defendant should shut down production of the flares immediately and notify the customers of the hazard. The production line was shut down immediately, but Defendant did not immediately notify the customers of the problem. Instead, Defendant collected information on whether the flares were still under warranty and how many outstanding contracts for flares were affected.

25. One week later, on November 16, 2005, Paul Wecker, a Contract Manager for Defendant, wrote to the contracting officer for Hill Air Force Base. Wecker's letter to the Air Force informed the Air Force that two flares had failed a 10 foot and 5 foot drop test, respectively, and therefore the flares "may be more sensitive to impact in certain clocking orientations than provided for in the specification." Mr. Wecker informed the Air Force that ATK was conducting a "thorough" investigation and would notify the Air Force promptly of the results of the investigation and any recommendations. He did not inform the Air Force that the Defendant had been aware of this potential problem since 2000, or that the extent of the threat was greater than a drop from 5 feet. Defendant ATK sent a similar letter to Rock Island Arsenal,

and to each of the other flare customers, including Chile, Canada, Denmark, and Malaysia. All of the customers ceased using the flares in light of the hazard.

### E.     The False Claims: Supplying Defective Products

26.     Defendant knowingly supplied the Air Force with defective flares that did not comply with the contractual specification that they be safe when dropped from a height of 10 feet. Defendant's employees, including Ray Beus, Robert Elder, John Holland, and Michael Harper were aware that the flares could fail when dropped because of the new design. Defendant withheld this information from the Government, did not test the flares, and continued to ship the unsafe flares to the Air Force for its use. At all times from 2000 until November 2005, the Government was unaware that the flares that Defendant supplied were defective. If the Government had been aware that the flares did not meet the 10-foot drop safety specification, it would have immediately ceased using the flares, as it did in November 2005 when Defendant finally notified the Government that the flares might not meet the safety specifications.

27.     In support of the false claims for payment for defective products, Defendant submitted a number of false statements and records, including false certifications that the flares met the contractual specifications that they were safe when dropped from a height of 10 feet. When Defendant finally notified the Government in November 2005 that the flares might not conform to the safety specifications, Defendant failed to inform the Government of the extent of the safety threat -- that the flares might explode when dropped from a height of as little as 11 inches. Nor did Defendant inform the Government that it had been aware of the potential problem since 2000. Instead, Bob Winter instructed the relator not to mention to anyone information about Defendant's knowledge of the failure to safety test the flares. Dick Davidson,

Vice President of the Flares and Ordinance operations, informed the relator that his findings must be kept quiet to ensure that they did not "bring down the whole ship."

28.   Instead of informing the Government that the flares Defendant supplied were defective, Defendant proposed that it repair the flares for the Government at the Government's expense. Defendant estimated the cost of repairing each flare at approximately $250 per flare, or potentially one fourth to one third of the cost of an original flare. If some of the flares are destroyed during repair or the repair does not work and the flares need to be replaced, the repair costs would be substantially higher. Under any of these scenarios, the Government would end up paying a premium for products that Defendant knew at the outset were defective.

## Count I

### False Claims Act 31 U.S.C. §§ 3729(a)(1) and (a)(2)

29.   Relator repeats and realleges each and every allegation contained in paragraphs 1 through 28 above as though fully set forth herein.

30.   This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, et seq., as amended.

31.   By virtue of the acts described above, Defendant knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States Government for payment or approval within the meaning of 31 U.S.C. § 3729(a)(1).

32.   By virtue of the acts described above, Defendant knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false and fraudulent claims paid or approved, within the meaning of 31 U.S.C. § 3729(a)(2).

33. The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the Defendant, paid claims that would not be paid but for Defendant' unlawful conduct.

34. By reason of the Defendant' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

35. Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by Defendant arising from their unlawful conduct as described herein.

**Prayer**

WHEREFORE, Relator prays for judgment against the Defendant as follows:

1. that Defendant cease and desist from violating 31 U.S.C. § 3729 et seq.,

2. that this Court enter judgment against Defendant in an amount equal to three times the amount of damages the United States has sustained because of Defendant's actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

3. that Relator be awarded the maximum amount allowed pursuant to § 3730(d) of the False Claims Act,

4. that Relator be awarded all costs of this action, including attorneys' fees and expenses; and

5. that Relator recover such other relief as the Court deems just and proper.

## Demand for Jury Trial

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: April 10, 2006

FILLMORE SPENCER LLC

By: *Matthew R. Howell*
Matthew R. Howell
FILLMORE SPENCER LLC
3301 North University Avenue
Provo, Utah 84604
Tel: (801) 426-8200
Fax: (801) 426-8208

PHILLIPS & COHEN LLP

By: *[signature]*
Eric R. Havian (California Bar No. 102295)
Claire M. Sylvia (California Bar No. 138990)
PHILLIPS & COHEN LLP
131 Steuart Street, Suite 501
San Francisco, CA 94105
Tel: (415) 836-9000
Fax: (415) 836-9001

Attorneys for Qui Tam Plaintiff Kendall Dye

Plaintiff's Address:

2361 North Legacy Drive
Ogden, UT 84414

**EXHIBIT A**

Case 1:06-cv-00039-CW-DN   Document 1   Filed 04/10/2006   Page 15 of 17

**From:** Ray W. Beus
**To:** Elder, Robert M.
**Date:** Fri, May 26, 2000 12:17 PM
**Subject:** LUU-19 Igniter Test Report

Bob,
Here is the simple memo report you requested. Because there are a number of photographs, I decided not to include them in the body of the memo but rather as an appendix. I expect you will modify/delete any sensitive information should you have to forward this to outside recipients.

You probably did not expect the thermocouple data, the copper block test or the "no foil tape" test, as it was not part of the request, however, I made a management decision to do so for maintaining our reputation as "Hazards" Testing Team. If this is inappropriate, then I am to blame. We were still able to do all this and stay within our budget!

We have all the inert items from the test in a box for you to pick up. The videotape and conditioning tempchart is also here for you to take. The videotape is the original, no copies have been made. Would you like the BKNO3 pellets also, or shall we dispose of them here?

Speaking of Hazards, the impetus to perform these tests were from my point of view bordering on a waste of time, since I cannot comprehend how the primary ignition could ever occur as the customer suggest. To counter this, I would strongly suggest a more realistic scenario which might present a significant hazard to personnel/equipment: If the flare assembly receives a significant impact (i.e. dropped) I can foresee the inertia of the slider mechanism breaking the piece of polycarbonate that retains the ignition train in the no-fire position, resulting in complete ignition of the flare. Based on this scenario, I would recommend a few tests be performed to validate a drop height in determining a safe design (MIL-STD-331B, modified test A3 & A4.1). The drop would need to assure "specific orientation" so impact attitude is controlled. I am certain that Design Engineering has performed this calculation but I am not certain the test has been run to validate such calculations. You can relax, rest assured I did not include this comment/recommendation in the memo although I would have liked to.

If I can be of further assistance, please contact me.
Respectfully,
- Ray Beus


**CC:**　　　　Harper, Michael R., Holland, John

%JS 44 (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS
Sealed

**DEFENDANTS**
Sealed

FILED
U.S. DISTRICT COURT

(b) County of Residence of First Listed Plaintiff: **Weber**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: _____
(IN U.S. PLAINTIFF CASES ONLY)

2006 APR 10 P 4:24

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

DISTRICT OF UTAH

BY: _____ DEPUTY CLERK

(c) Attorney's (Firm Name, Address, and Telephone Number):
Matthew R. Howell, Fillmore Spencer LLC
3301 N. University Ave Provo UT 84604

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [X] 1 U.S. Government Plaintiff
- [ ] 2 U.S. Government Defendant
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [X] 1 | [X] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [X] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 |  | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 365 Personal Injury - Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 690 Other |  | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 196 Franchise |  | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | [X] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** / **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| ☐ 210 Land Condemnation | ☐ 441 Voting / ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations / **Habeas Corpus:** |  | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 240 Torts to Land | ☐ 530 General |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare / ☐ 535 Death Penalty |  |  | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment / ☐ 540 Mandamus & Other |  |  | ☐ 950 Constitutionality of State Statutes |
|  | ☐ 446 Amer. w/Disabilities - Other / ☐ 550 Civil Rights |  |  |  |
|  | ☐ 440 Other Civil Rights / ☐ 555 Prison Condition |  |  |  |

## V. ORIGIN (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
**31 USC 3729**
Brief description of cause: **Qui tam False Claims Act**

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND: [X] Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
(See instructions): JUDGE _____ DOCKET NUMBER _____

DATE: **4/10/06**
SIGNATURE OF ATTORNEY OF RECORD: *Matthew R. Howell*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____

Judge Ted Stewart
DECK TYPE: Civil
DATE STAMP: 04/10/2006 @ 16:21:44
CASE NUMBER: 1:06CV00039 TS